# United States Court of Appeals

*for the*

# Federal Circuit

JAMES L. PATEREK, in his own right and as best friend of J.P.,

*Petitioner-Appellee,*

– v. –

SECRETARY OF HEALTH AND HUMAN SERVICES,

*Respondent-Appellant.*

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
IN CASE NO. 02-VV-411, JUDGE SUSAN G. BRADEN

## BRIEF FOR PETITIONER-APPELLEE

JOHN F. MCHUGH, P.C.
Six Water Street, Suite 401
New York, New York 10004
(212) 483-0875

*Attorneys for Petitioner-Appellee*

September 20, 2012

Form 9

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

James Paterek _____ v. HHS _____

No. 12-5078

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
John F. McHugh _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

James Paterek

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

James Paterek, Jr.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4. [✓]  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

John F. McHugh, Esq.
Gilbert Gaynor, Esq,

5/23/12
Date

_____
Signature of counsel

_John F. McHugh_
Printed name of counsel

Please Note: All questions must be answered
cc: Thomas M. Bondy, Teal Luthy Miller, Michael P. Milmoe

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF RELATED CASES ....................................................vi

STATEMENT OF JURISDICTION.........................................................1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ..............................1

STATEMENT OF THE CASE................................................................2

    A. The Initial Special Master Proceeding.......................................3

    B. The Initial United States Court of Federal Claims
       Proceeding .......................................................................4

    C. The Remand Proceeding Before Special Master III ...................5

    D. The Second United States Court of Claims Proceeding............8

STATEMENT OF FACTS ....................................................................9

MEDICAL TESTIMONY ...................................................................20

    Dr. Victor Turow, M.D....................................................................20

    Dr. Eugene Spitz, M.D. ...............................................................24

    Dr. Mary Megson, M.D. ...............................................................27

    Dr. John Shane, M.D. ..................................................................28

    Dr. Max Wiznitzer, M.D. ..............................................................30

i

STANDARD OF REVIEW ...................................................................30

SUMMARY OF THE ARGUMENT ....................................................31

ARGUMENT .......................................................................................33

I.  THE CLAIMS COURT CORRECTLY DETERMINED
THAT PERTUSSIS CAN CAUSE CHRONIC (STATIC)
ENCEPHALOPATHY............................................................................33

II. THE COURT BELOW CORRECTLY FOUND
THAT SPECIAL MASTER III'S DECISION THAT
THE APPELLEE HAD NOT ESTABLISHED A LOGICAL
CONNECTION BETWEEN THE VACCINATION
AND HIS STATIC ENCEPHALOPATHY WAS NOT
SUPPORTED BY THE RECORD AND WAS THUS,
ARBITRARY AND CAPRICIOUS AND OTHERWISE NOT
ACCORDING TO LAW .........................................................................35

III. THE SPECIAL MASTER ERRED IN DEEMING JP'S
EYE MOVEMENTS STRABISMUS AS NO EVIDENCE IN
THIS RECORD SUPPORTS THAT CONCLUSION .............................39

IV. THE COURT BELOW CORRECTLY FOUND THAT
SPECIAL MASTER III'S RELIANCE ON PORTIONS OF THE
MEDICAL RECORDS WAS ERROR, WHERE, AS HERE,
SUBSTANTIAL UNCONTESTED TESTIMONY DISCREDITED
THOSE PORTIONS OF THE PEDIATRIC RECORDS........................42

V. THE COURT BELOW CORRECTLY DETERMINED
THAT SPECIAL MASTER III DID NOT CONSIDER THE
RECORD AS A WHOLE .......................................................................46

VI. DR. TUROW'S TESTIMONY SUPPORTS THE
CONCLUSION THAT JP MORE LIKELY THAN NOT
SUFFERED A VACCINE INJURY........................................................48

CONCLUSION ....................................................................................49

CERTIFICATE OF COMPLIANCE.....................................................51

# TABLE OF AUTHORITIES

## CASES

*Adams v. United States*,
    1998 WL 804552 (Fed. Cir. Sept.23, 1998) ..................................................44

*Allen v. State Bd. of Ed. of N. C.*,
    55 F.R.D. 350 (M.D.N.C. 1972) ....................................................................34

*Althen v. Sec'y of HHS*,
    418 F.3d 1274 (Fed. Cir. 2005) ...................................................4, 7,30, 33, 34

*Burgos v. City of Rochester*,
    2003 WL 22956907 (W.D.N.Y. 2003) ..........................................................41

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) ......................38

*Butler v. Eaton*, 141 U.S. 240 (1891) ....................................................................34

*Camery v. Sec'y of Health and Human Servs.*,
    42 Fed.Cl. 381 (Fed. CL. 1998) ....................................................................45

*Campbell v. Sec'y of Health and Human Servs*,
    69 Fed. 650 (Fed. Cl. 2006) ....................................................................45, 50

*Clark v. Sec'y of Health and Human Servs.*,
    1991 WL 57051 (Fed. Cl. 1991) ....................................................................45

*Cucuras v. Sec'y of Health & Human Servs.*,
    993 F.2d 1525 (Fed. Cir. 1993) ....................................................................43

*Dobrydneva v. Sec'y H.H.D.,*
    94 Fed. Cl. 134 (Fed. Cl. 2010) ..............................................................42, 50

*Dobrydneva v. Secretary of Health and Human Services*
    98 Fed.Cl. 190 (Fed.Cl.2011) ........................................................................50

iii

*Doe 21 v. Secretary H.H.S.,*
        84 Fed. Cl. 46 (Cl. Ct. 2008) ......................................................................43

*Douglas v. Victor Capital Gr.,*
        21 F. Supp. 2d 379 (S.D.N.Y. 2008) ...........................................................40

*Felice v. Long Island Railroad Co.,*
        426 F.2d 192 (2d Cir. 1970) ........................................................................41

*Hines v. Sec'y of Health and Hyman Serv's,*
        940 F. 2d 1518 (Fed. Cir,1991) ...................................................................30

*Hunt ex rel. Alva v. Secretary of Dept. of Health and Human Services,*
        2010 WL 1783541(Fed. Cl., 2010)...............................................................37

*John Doe 21, v. Secretary H.H.S.*
        84 Fed. Cl. 19 (Fed. Cl. 2008) .......................................................................4

*Loving ex. rel. Loving v. Sec'y of Dept. of Health & HumanServs,*
        86 Fed. Cl. 135 (2009)....................................................................39, 44,50

*Markovitz v. Sec'y. Health and Human Servs,*
        477 F. 3d 1353 (Fed. Cir. 2007) ............... 2, 30, 31, 32, 33, 37, 38, 41, 42, 43

*Morse v. Sec'y H.H.S.,*
        93 Fed.  Cl, 780 (2009).................................................................................50

*Perez v. Sec'y of H.H.S.,*
        2008 WL 763301 (Cl. Ct. 2008)...................................................................33

*Raley v. Secretary of HHS,*
        1998 WL 681467 (Fed. Cl. 1998)..................................................................41

*Sharpnack v. Secretary of Dept. of Health,*
        1992 WL 167255 (Cl. Ct., 1992),
        affirmed 17 F.3d 1442 (Fed. Cir. 1994) ........................................................37

*Tebcherani, by Tebcherani v. Sec'y of HHS,*
    55 Fed.Cl. 460 (2003) ...................................................................................47

*United States v. Hinkson*,
    585 F.3d 1247 (9th Cir. 2009) ....................................................................38

*Whitecotton v. Secretary of Health and Human Services*,
    81 F.3d 1099 (Fed. Cir., 1996) ..............................................................30, 37

*Wilkerson v. Secretary of Health and Human Services*
593 F.3d 1343 (Fed. Cir, 2010).................................................................41

## STATUTES AND RULES

42 U.S.C. § 300aa–12(e)(2)(B)....................................................................30

42 U.S.C. §300aa-13 ......................................................................................1

42 U.S.C. § 300aa–13(b)..............................................................................37

42 C.F.R. §100.3 ......................................................................................1, 33

Fed. R. Evid. §801-03 .................................................................................40

## CONGRESSIONAL

1989 U.S.C.C.A.N. 3018, H.R. Rep. No. 101-386, 515 ........................................34

## STATEMENT OF RELATED CASES

Counsel is aware of no related cases within the meaning of Fed. Cir. Rule 47.5.

## STATEMENT OF JURISDICTION

Appellee concurs with Appellant's Statement of Jurisdiction.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

The salient issue on this appeal is whether the Court of Federal Claims, (hereinafter Claims Court) properly found that Appellee had met all the conditions for entitlement to compensation established by this Court pursuant to 42 U.S.C. §300aa-13, and properly reversed the Special Master as his decision to deny compensation was arbitrary, capricious and not in accord with the law, where, as here:

a.  the fact that Appellee (hereinafter "JP") had an adverse reaction to the vaccine was admitted by the Appellant;

b.  the fact that JP was suffering from a chronic "static" encephalopathy as defined by 42 C.F.R. §100.3 by May of 2000 was admitted by Appellant;

c.  the Claims Court found that Petitioner presented substantial evidence to establish that the continuing effects of the admitted reaction to the vaccination were detected within the months between the onset of JP's condition on July 20, 1999 and March, 2000, when he finally missed

1

sufficient developmental milestones to be diagnosed as developmentally delayed; and

Did the Claims Court properly find that the Special Master's disregard of the evidence by,

a. construing symptoms of abnormal development to be normal, by ignoring the credible medical evidence, including the treating pediatrician's testimony;

b. deeming symptoms seen earlier as unrelated to JP's injury,

was a failure to follow the mandate of *Markovitz v. Sec'y. Health and Human Servs, 477 F. 3d 1353,1358 (Fed. Cir. 2007,* and thus arbitrary, capricious and not according to law.

## STATEMENT OF THE CASE

On July 20, 1999, JP, a normally developing two month old boy, received a DTaP vaccination.  It contained pertussis toxoid. Appellant conceded that JP had an adverse reaction to that portion of the vaccine. Appellant also conceded that JP was diagnosed with a static encephalopathy by May of  2000, a condition that is permanent.   Appendix-337 (hereinafter references to the Appendix will be designated A-).

2

A. The Initial Special Master Proceeding

Appellee's petition, filed on April 30, 2002, alleged alternative theories of compensation under both the Vaccine Injury Table and a cause-in-fact theory. The case was initially assigned to Special Master E. LaVon French ("Special Master I"). Subsequently Special Master I retired, and on December 22, 2004, the case was reassigned to Special Master John F. Edwards ("Special Master II").

On October 27, 2005 and October 28, 2005, a hearing was held before Special Master II during which three fact witnesses testified, Appellee's father, grandmother and neighbor, in addition to Appellee's expert Dr. Eugene Spitz and Appellant's expert Dr. Max Wiznitzer. Dr. Spitz testified about Appellee's Table claim that included the events occurring within six months following the vaccination. During his testimony, Dr. Spitz sought to testify about the interpretation a 2002 MRI of JP, based upon the disk image in evidence. Special Master II would not allow that testimony as the radiologist's report on that MRI was not among the documents filed. Special Master II left the record open for more expert testimony on Appellee's causation-in-fact theory, A-27, and with regard to the 2002 MRI to occur when the missing document was filed.

On July 20, 2007, Special Master II convened a second hearing. In the interim, however, Dr. Spitz passed away and appellee retained Dr. John Shane. At

3

the hearing, Special Master II only allowed Dr. Shane to testify on issues regarding Appellee's MRI. Dr. Shane was prevented from offering any testimony as to causation in fact. A-27.

On May 22, 2008, Special Master II issued an Unpublished Decision (Fact Witness/Medical Expert Credibility Ruling). Special Master II found in favor of the appellant, dismissing both appellee's Table and causation-in-fact claims.

B. The Initial United States Court Of Federal Claims Proceeding

On July 7, 2008, appellee filed a Motion For Review in the United States Court of Federal Claims. On August 6, 2008, the appellant filed a response. On October 21, 2008, the Claims Court issued a Memorandum Opinion and Final Order holding that Special Master II correctly determined that Appellee did not establish a Table injury. See *John Doe 21*, 84 Fed. Cl. 19, 46 (Fed. Cl. 2008). The Claims Court also held that Special Master II failed to adhere to the burden of proof established by the United States Court of Appeals for the Federal Circuit in *Althen v. Sec'y of HHS*, 418 F.3d 1274, 1278 (Fed.Cir.2005), and instead required Appellee to rebut the Government's alternative theory of causation before determining whether Appellee's current condition was causally connected to a post-vaccine adverse reaction. *John Doe, supra* at 47–48. The Claims Court also determined that Special Master II erred in prohibiting Appellee's expert, Dr. Shane,

4

from completing his testimony and fully presenting his theory about Appellee's vaccines and their relationship to Appellee's injury. Id. at 48–49. The Court also found that Special Master II erred in making a credibility determination about the medical records of Dr. Eviatar without testimony. Id. at 48. Accordingly, the Claims Court remanded the case to Special Master Christian Moran ("Special Master III"), assigned the case upon Special Master II's retirement, with "instructions to reopen the record to allow: Appellee's Expert Dr. Shane to complete his ... testimony; Dr. Eviatar to address [Special Master II]'s suspicions ...; and any additional rebuttal the Government requires." Id. at 50 (internal quotations omitted).

C. The Remand Proceeding Before Special Master III.

On October 30, 2008, Appellee filed Dr. Shane's Supplemental Expert Report and on November 21, 2008, the Expert Report from Dr. Mary Norfleet Megson, a newly retained expert, neither of which were objected to by Appellant. The Appellant filed Dr. Wiznitzer's Supplemental Expert Report. On December 19, 2008 the Appellant filed further exhibits, including a response from Dr. Eviatar.

On December 2, 2008, Special Master III convened a remand hearing. Appellee called four witnesses: Appellee's father, Dr. Shane, Dr. Megson, and Dr. Victor Turow. Appellant called only Dr. Wiznitzer.

On January 16, 2009, Special Master III issued a Decision On Remand Denying Entitlement, premised on two principal findings. See A-47. First, Special Master III found that Appellee "was developing at a normal pace" between July 20, 1999, the date of his initial DTaP vaccination, and six months later, i.e., March 2000. Id. In making this finding, Special Master III reviewed the medical records of Appellee's two month, four month, six month, and nine month health maintenance visits, where Appellee's "developmental progress was specifically reflected in [the] examinations." Id. In addition, Special Master III found that testimony by Appellee's experts, Dr. Shane and Dr. Megson, did not contradict the conclusion that Appellee was developing normally at nine-months." A-59. This statement was grossly incorrect. Dr. Megson found him delayed and Dr. Shane expressed no opinion. See infra.

Second, Special Master III found that the testimony of Dr. Spitz "was generally not relevant to determining whether [Appellee] suffered a developmental delay," but primarily related to whether Appellee had suffered a Table injury, which was not an issue on remand. A-59. Special Master III also found the

6

testimony of Appellee's other two experts, Dr. Megson and Dr. Shane, was not persuasive "[o]n critical points[.]" Id. Special Master III found that Dr. Megson was unable to "explain her opinion in such a way to demonstrate that her opinion [was] reliable." A-60. Dr. Shane's opinions "were overstated" and "not well supported." A-61.

Special Master III then proceeded to analyze Appellee's two causation theories, using the previously discussed general findings to support his decision. A-62. As to Appellee's first theory, i.e., that the July 20, 1999 DTaP vaccination caused an encephalopathy resulting in Appellee's injuries, Special Master III concluded that Appellee failed to satisfy the logical sequence prong and the timing prong of the causation-in-fact test established in *Althen, surpra*, 1278 (holding that a petitioner must show "a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and showing a proximate temporal relationship between vaccination and injury"). See A-62-73. Therefore, Special Master III concluded that Appellee failed to establish that Appellee's "current condition constitutes a sequella to the adverse reaction [that Appellee] experience on July 20, 1999." Special Master III found that it was "not necessary to determine whether the DTaP vaccine caused an adverse reaction using the *Althen* three-part test, because the Government conceded that the vaccination caused an adverse

reaction." A-73.  Instead, Special Master III determined that the relevant issue was whether Appellee could establish that the residual effects or complications of the adverse reaction lasted more than six months.  Id.  Special Master III found that Appellee was unable to show by a preponderance of the evidence that Appellee's adverse reaction existed during the   six month period after the initial adverse reaction. A-74.

 D.  The Second United States Court of Claims Proceeding

Petitioner filed a petition for Review.  The Claims Court held that a medical theory causally connecting diphtheria-tetanus-pertussis (DTaP) vaccination and encephalopathy is established by the Vaccine Injury Table and has been well recognized by the Office of Special Masters, establishing a reputable medical theory of causation.  Petitioner concededly had an adverse reaction to the vaccination less than 24 hours after initial diphtheria-tetanus-pertussis (DTaP) which established proximate temporal relationship between vaccination and injury. The testimony of JP's  treating physician establishing the existence of symptoms of his encephalopathy in October and  November  1999 and  January of 2000, following the adverse reaction, established a logical sequence of cause and effect, as required to establish causation-in-fact for non-table injury under the Vaccine Act, even where the treating physician did not unequivocally state that the

8

vaccination caused the injury.  Notably after July 20, 1999, pertussis was withheld from all further vaccinations by the treating physician's practice.

The Claims Court correctly held that the complete medical history of a petitioner is relevant in ascertaining a logical sequence of cause and effect, because significant symptoms which developed or were seen later explained earlier events. Special Master III's selective review of medical records and only within a limited time frame, resulted in an erroneous determination and violated binding precedent that decisions be based upon the entire record.

Therefore, Appellee's medical records, as explained by his treating physician, established that JP's static encephalopathy existed from the date of the vaccination.  The Special Master's analysis of the symptoms as being of normal development by isolating them from all subsequent recorded events, and holding that JP's static encephalopathy suddenly arose between  January and March of 2000 with no precipitating event to explain such onset, was arbitrary and capricious and not according to  law.

## STATEMENT OF FACTS

JP  was  at  born  at  the  North  Shore  University  Hospital,  in Manhasset,  New York, on May 11, 1999, after an uneventful pregnancy and birth.  A-1189-1212.

Approximately three hours after receiving a DTaP vaccination during his two-month well baby examination on July 20, 1999, JP experienced an adverse reaction to the vaccination during which his complexion turned bluish, his head hung to the side, his eyes moved backwards, he was drooling, and would not make eye contact. A-846, 848, 907-908.  JP was taken to the North Shore University Hospital emergency room (hereinafter "ER") where his fever upon arrival was 101 degrees, and the primary complaint reflected in the records was "crossed eyes, moaning, acting unusual".  The triage nurse recorded that JP received a DTaP vaccine earlier in the day and developed a fever,[1] and the resident's notes reflect "fever and a ten minute episode of eye crossing, without tonic/clonic activity[2], drooling ."  A-1224-1227.

Subsequent tests, including blood and urine samples were negative, A-1228-1239, and a neurological examination showed no "focal deficits"

---

[1] In 1994, the Institute of Medicine (hereinafter "IOM") reported that:

[2] A "generalized tonic-clonic seizure" is a "seizure of grand mal epilepsy, consisting of loss of consciousness and generalized tonic convulsions followed by clonic convulsions," Dorland's at 1676.  "Grand mal epilepsy" is a symptomatic form of epilepsy often preceded by an aura; characterized by loss of consciousness with generalized tonic-clonic seizures.: Id. at 628. A-10.

10

and a regular flat fontanelle.[3] JP was diagnosed with a fever, advised to take Tylenol, to follow-up with his pediatrician in the morning, which, a note in the pediatric medical records indicates occurred.  JP was released from the emergency room in "satisfactory" condition. Id; A-1228.

Thereafter, JP was seen and evaluated by numerous other physicians of varying disciplines, and underwent numerous diagnostic tests and procedures in connection with the adverse reaction he suffered as a result of the July 20, 1999 vaccination, which shall be discussed *infra.* No accident or other incident has been identified to explain his static encephalopathy other than the adverse reaction to the  July 20, 1999 vaccinations.  A-1472.

Prior to July 20, 1999,  JP was described as an active, alert and playful infant who was attracted to lights, followed sounds, and interacted with adults and children.  Indeed, he was so active that there was concern that he would roll off his changing table. A-839, 843-846, 845, 870-874. That analysis was largely confirmed by JP's examination on July 20, 1999, which states that he turned to voice, rolled to his side, cooed,

[3] A"fontanelle" is "[o]ne of several membranous intervals between the angles and margins of the cranial bones in the infant." Stedman's at 755. A-10.

11

vocalized, focused on face and smiled. A-1223. Angela Dazzo, JP's maternal grandmother, and Loretta Costello, a family friend and neighbor, both testified that after July 20, 1999, JP seemed to be a different child. He was no longer playful, no longer made eye contact, nor followed sound. A-870, 895, 888-889. Both Mr. Paterek and Ms. Dazzo further testified that after the vaccination JP's muscle tone changed, he felt like a sponge, A-885-887, 889, 931, 946-947, and that many of the skills he had acquired before the vaccination were no longer apparent. He also took a long time to finish a bottle, as sucking and swallowing became difficult. A-915-918, 883-884. Mr. Paterek testified that he had called JP's pediatric practice on several occasions in the summer and fall of 1999 to discuss his concerns.

On September 14, 1999, JP had his four-month well baby examination during which he received vaccinations absent the pertussis[4]

---

[4] Pertussis vaccine is "a suspension of killed Bordetalla pertussis organisms (whole cell vaccine) or a fraction thereof (acellular) either fluid (pertussis vaccine [USP]) or absorbed on aluminum hydroxide or aluminum phosphate and resuspended (pertussis vaccine absorbed [UDP]); used for routine immunization against pertussis (whooping cough). It is generally used in a mixture of diphtheria and tetanus toxoids. (DTP or DTaP). Dorland's at 1999. A-11.

portion of DTaP that was omitted due to the hypotonic-[illegible][5] reaction

JP had to the July 20, 1999 vaccination.    There is no support for

Appellant's assertion that this was a result of JP's mother's insistence. A-

1220, 1245.  Although the medical records for that same date reflect that

JP was social, able to sit, hold his head, and babble, A-1244,  as will be

discussed in more detail *infra,* both Dr. Turow and the appellant's expert,

Dr. Max Wiznitzer, questioned the accuracy of this record as they agreed

that a four month old cannot sit without support.  A-416, A-1052.  Dr.

Megson in response to the Special Master also questioned the accuracy of

this record.  A-529.

Mr. Paterek and Ms. Dazzo testified that sometime in the fall of

1999,  JP 's eyes rolled back into his head, he began to shake, and his face

turned beet red. A-879-882, 922. Mr. Paterek immediately called JP's

pediatrician who told him that it was not an unusual occurrence, and  Ms.

Dazzo reported the episode at a later medical visit, A-880, 923, neither of

which reports are found in the medical records.  Dr. Turow confirmed that

the response of his partners reported by these witnesses was consistent

---

[5] "Hypotonia" is "a condition of diminished tone of the skeletal muscles;
diminished resistance of  muscles to passive stretching." Dorland's at 900.  A-15.

13

with his practice's policy of not acting on or recording such complaints. A-429-30.

On October 4, 1999, during an office visit, JP's parent's informed Dr. Turow that JP was experiencing strange eye movements. Dr. Turow did not see these eye movements but thought that they might be strabismus[6] or pseudostrabismus[7]. A- 346-47, 1248. He referred JP to Dr. Steven Rubin, a pediatric ophthalmologist, who examined JP on November 10, 1999. Although Dr. Rubin did not observe these eye movements, he concluded that JP was most likely evidencing pseudostrabismus, a benign condition. A-346-347, 401, 1257.

On November 8, 1999, during JP's six-month examination, the medical notes reflect that JP still hadn't rolled over, and was unable to sit without support. Dr. Turow, in reviewing that record, found JP to be "on the verge" of being delayed due to his failure to roll over both ways, although JP was still deemed to be developing normally by the examining physician. A- 369, 384, 1252-1254.

---

[6] "a manifest lack of parallelism of the fisual axes of the eyes" Stedman's at 1841. A-12.

[7] "the appearance of strabismus caused by epicanthus, abnormality in the interotbital distance, or corneal light reflex not corresponding to the center of the pupil." Steadmans at 1593. A-12.

14

On January 31, 2000, during his nine-month examination, the medical notes reflect that JP could not yet pull to stand or to cruise. Dr. Turow reviewed the medical records for that date and testified that that record showed JP's developmental skills were those of a six to seven month old. A- 422, 1264. Dr. Wiznitzer testified that the record showed that JP was toward the lower border of normal development, A-579-80, and Dr. Megson testified that she would have referred JP for special services based upon this record. A-533. Thus, JP was between 25 and 33% delayed as of January 31, 2000.

On March 17, 2000, JP had a "head ultrasound" due to an enlarged head size. A- 1273. The ultra-sound revealed prominent extra-axial spaces consistent with benign external hydrocephalus, which Dr. Turow testified was not a "pathological" condition. A-428, 1273.

On March 27, 2000, JP was diagnosed as developmentally delayed by Dr. Fagen, a doctor at North Shore University Hospital. During that examination, JP manifested the eye movements his parents had been reporting since October 4, 1999. Dr. Fagen, the first doctor to actually

15

observe these movements,   diagnosed JP with vertical nystagmus.[8] A-1493, 1272.

On March 29, 2000, an assessment for the Nassau County Department of Health by the Louise Oberkotter Early Childhood Center noted that JP had had no serious injury other than his reaction to pertussis that explained his condition.  JP was ten and a half months old and was unable to place himself in a sitting position, but could sit when placed for 3-4 minutes.  He could not pull to stand, crawl on his belly or creep, nor did he have pincer grasp.  He was determined to be functioning at  5.5-7 months on gross motor skills, and 7-8.5 on fine motor.A-1471-1475.

On March 30, 2000, Dr. Turow finally observed the eye movements, an episode of vertical nystagmus, and immediately referred JP to Dr. Gould, a pediatric neurologist.  By the time JP reached Dr. Gould's office, the episode had subsided, and accordingly Dr. Gould was unable to observe it.  A- 1272,1277.  Thereafter, JP was referred to numerous experts for his intermittent nystagmus most of whom did not witness it. A- 1272, 1275, 1281.

---

[8] "Nystagmus" is the "[i]nvoluntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component." Stedman's at 1350. A-14.

On May 8, 2000, during pre-admission testing for a double myringotomy to install tubes in JP's ears because of fluid in his middle ear, after reviewing JP's medical record of July 20, 1999, Dr. Mark Goldstein noted "? seizure after DPT". A-1364-1366, 1368, 1377.

On May 22, 2000, Dr. Turow saw JP for his twelve-month examination. On that date Dr. Turow determined that based upon the fact that JP could only sit when he was placed, was not rolling from side to side well, and was not getting to all fours, JP was two standards deviations below the mean, the deviation from the norm deemed necessary to diagnose developmental delay. A- 375-376, 1265, 1287.

On June 13, 2000, in preparation for an  EEG at North Shore Hospital, JP was sedated because he was experiencing "fluttering eye and hand shaking".  The results of the EEG was that JP was within normal limits.  A-1292.

On June 22, 2000, Dr. Joseph Zito, M.D., a neuroradiologist, performed a cranial MRI that he concluded was normal, after finding "no evidence of mass effect in the ventricular system and subarachnoid spaces, and no extraaxial mass or fluid collections." Id. at 98, A- 1305, 1765.

17

On October 12, 2000, Dr. Rubin, who had initially seen JP on November 10, 1999, saw JP for a follow-up appointment during which he "confirmed the presence of an infrequent, intermittent upbeat nystagmus[9] which had apparently evaded detection at (JP's) many prior examinations." Id. Dr. Rubin thereafter referred JP to a neuro-opthamologist for further examination of his "intermittent vertical nystagmus." Id. at 109-110.

On October 23, 2000, January 10, 2001, March 8, 2001, June 26, 2001, September 20, 2001, October 5, 2001, November 8-9, 2001, and March 27, 2002, JP was evaluated by numerous agencies and was consistently found to be between 25% and 50% delayed in motor skills. A- 1487, 1451-53, 1494-1495, 1496, 1497-1499, 1502-1525, 1461.

On August 14, 2001 JP had a neurological consultation with Dr. Lydia Eviatar, M.D., a pediatric neurologist, whose diagnostic impression was that JP had gross, fine motor, speech and language delays,

---

[9] "Upbeat nystagmus" is a "vertical nystagmus with the fast phase upward occurring in lesions of the vermis cerebelli." Dorland's at 1296. The "vermis cerebelli" is the "narrow median part of the cerebellum, between the two lateral hemispheres." Id. at 2033. The "cerebellum" is the part of the brain that occupies the posterior cranial fossa behind the brain stem and is concerned in the coordination of movements." Id. at 336. A-17.

as well as mild pervasive developmental disorder. A- 1351,1353, 1744-1746.

On May 3, 2002, JP had a magnetic resonance angiography ("MRA") to rule out aneurysm, and an MRI.   There were "[n]o intracranial vascular anomalies." A-2281.   There was "no evidence of temporal lobal pathology".   A re-read of this MRI on April, 27, 2005, found "evidence of bilateral tonsillar herniation of the cerebellar tonsils[10] of approximately 7-8mm." There is no hydrocephalus or syrinx. A-2283.

On May 10, 2005, JP had another MRI of his brain, cervical, thoracic and lumbar spine, and a cerebrospinal fluid flow study. See A-1545. The MRI results showed a 9mm of inferior cerebellar tonsillar ectopia.

On May 15, 2005, JP had surgery at New York Presbyterian Hospital  to relieve any problem associated with a perceived Chiari I Malformation. A-2268.

---

[10] "Tonsil of the cerebellum" is a "rounded lobule on the underside of each cerebellar hemisphere, continuous medially with the uvula of the cerebellar verones." Stedman's at 1999. A-25.

Dr. Zito, A-1765, and Dr. Pavlakis, A-1762-63, both of whom had read JT's earlier studies in 2000 and 2002 respectively, re-read them once the Chiari Malformation was deemed by Dr. Wiznitzer to explain JP's issues. Neither found a Chiari I Malformation before the 2005 study, and neither deemed the condition found in 2005 to explain any of JP's issues.

## MEDICAL TESTIMONY

Dr. Victor Turow, M.D., F.A.A.P. has been a member of the Department of Pediatrics of the North Shore University Hospital in Manhasset, New York, since 1981. Dr. Turow was one of JP's treating physicians from birth through the time of his testimony on December 2, 2008. A-423.

Dr. Turow was called as a witness to explain his practices policy with respect to the inclusion of certain materials in medical records, as well as to interpret notations contained in the records. Dr. Turow testified that notations written during "sick baby" visits to the effect that the patient was "alert, active and in no acute distress", were only in reference to how sick the child was, and were not indications of neurological or other developmental status. A-396-397. He further testified that where parents articulated concerns that did not require immediate attention, such as a referral or a prescription, or where parents were concerned that a child had not repeated a certain skill which had been achieved

20

early, it was not his practice's policy to record such parental concerns. A-429-430, 436. Dr. Turow's testimony was consistent with the conclusion of the Court of Claims in the remand decision that JP's pediatric records were incomplete. A-130. Dr. Spitz testified that in his experience pediatric practices neurological records were not reliable. Dr. Spitz's testimony was quoted by the Claim's Court extensively in the remand decision. A-100-103.

Dr. Turow testified that his interpretation of JP's pre-vaccination two-month examination on July 20, 1999, was that JP's developmental progress was slightly advanced due to the notations that indicated that he could roll to the side. A-361-362, 370, 435. He further testified regarding the emergency room ("ER") records from later that day. First, he indicated that the record generated in the ER would not fully reflect JP's condition on that evening, since by the time JP arrived at the ER, the symptoms witnessed by his parents and neighbor had subsided, a common occurrence in those types of situations. A-411. Dr. Turow testified that he believed that it was possible that JP suffered ". . . a significant reaction which changed the way his brain works over time". A-427. Dr. Turow testified that JP had a reaction to the DTaP vaccination that Dr. Turow had witnessed in patients in the past, and which is still listed as a possible adverse reaction to the DTaP vaccination. A-419-420.

Regarding JP's September 14, 1999 four month examination, Dr. Turow testified that the entries were vague, and that he didn't know what they meant. See A-416. Additionally, he questioned their accuracy. They indicate that JP could sit, a skill a four month old is incapable of. Id. Dr. Witznitzer, Appellants's expert pediatric neurologist, concurred. A-1052. Thus, the four month developmental record is unreliable.

Dr. Turow saw JP on October 4, 1999, at which time JP's parents reported JP's strange eye movements. Dr. Turow did not witness the condition, but thought it could be either strabismus or pseudostrabismus and referred JP to Dr. Rubin, a pediatric ophthalmologist who wrote a report on November 17, 1999 diagnosing pseudostrabismus. Dr. Turow testified that because this was a benign condition, any further parental concern about it would not be noted in the medical records until it was observed and found to be serious. See A-398, 429-430, 1073. He continued that although no physician actually diagnosed the condition as nystagmus until 2000, in his opinion it was more likely than not that this was what the parents saw and described during their October, 1999 visit. A-405-406. On March 30, 2000, Dr. Turow finally observed an episode of vertical nystagmus and immediately referred JP to Dr. Gould, a pediatric neurologist. However, in the few

minutes it took to get to Dr. Gould's office, the episode had subsided, and Dr. Gould was unable to observe it. A-1272,1275, 1277.

Dr. Turow also explained how developmental progress and delays are determined. He testified that in situations where a child achieves a developmental milestone early, if the child does not repeat it, it would only be noted in the records if it was not repeated by the correct developmental time. A-436. Accordingly, the concerns articulated by Mr. Paterek and Ms. Dazzo to JP's pediatricians during the summer and fall of 1999, would not be expected to be found in the records. He also explained that concerns about a child's development were not deemed abnormal until the child was two standard deviations below the mean. A-422-423.

Dr. Turow testified that on November 8, 1999, at JP's six-month examination, his failure to sit unsupported was an abnormal finding, and his failure to roll over, and only make sounds and coos rather than laughter, were matters of concern, placing him "on the verge" of being developmentally delayed.  A-369, 371-372, 384, 1253.

Dr. Turow testified that JP's nine-month evaluation on January 31, 2000, revealed a child who, although still not two standard deviations below the mean, could not pull to stand, and was therefore functioning on the level between a six

23

and seven month old. A-422, 1264.  Dr. Witznitzer concurred with Dr. Turow that JP was toward the border of being diagnosed as developementally delayed. A-384.

On March 17, 2000, after Dr. Turow observed that JP's head size was growing and an ultrasound was conducted that  found external hydrocephalus, a condition that was external to the brain and was not pathological. A-428, 1278.

On May 22, 2000, Dr. Turow saw JP for his one-year examination. During this examination, Dr. Turow determined that JP was two standard deviations below the mean, because although he was rolling from side to side, he was not doing it well, he was not getting to all fours, which he should have accomplished by seven months, and he did not have a pincer grasp. A375-377, 1265, 1287.

Dr. Eugene Spitz, M.D. was a pediatric neurologist neurosurgeon who testified on behalf of Appellee on October 28, 2005.  He was unable to conclude his testimony because he passed away in the one year seven month interim between October 28, 2005 and the adjourn date of July 7, 2007.  A-719, 723.

Dr. Spitz was Chief Neurologist at The Children's Hospital of Philadelphia for fifteen years.  During his career he treated over 15,000 pediatric neurology patients.  A-987.  Dr. Spitz developed the cure for hydrocephalus (water on the brain) and performed the first successful "shunt" operation in the early 1950's.

24

During his career, Dr. Spitz treated several hundred patients with Chiari I Malformations. A-1118. Although Dr. Spitz retired from his surgical service approximately fifteen years before the December 2, 2008 hearing, he nonetheless continued as a pediatric neurologist. A-984-987.

Dr. Spitz reviewed JP's July 20, 1999 emergency room records. He testified that although JP presented as normal, and the tests that were administered reported normal findings, seizures often leave no sign that they have occurred with 30-40 seconds after the occurrence. A-992. He testified that where, as here, a well child had a vaccination and "within hours of the inoculation there is a profound change in the baby, unresponsive, thrashes, not responsive, not trying to hold his head up, not feeding very well, a whole congeries of symptoms that led to all the neurology difficulty." A-988. He testified that in a child of two months, the symptoms of an encephalopathy were "mainly irritability", that JP was symptomatic during the six months following the adverse reaction, and that when he examined JP two and a half years before the hearing he was still suffering from symptoms of encephalopathy. A-988-989, 998,-1000.

With respect to JP's diagnosis of nystagmus, Dr. Spitz testified that nystagmus is a symptom of a neurological malfunction.[11] A-995. Regarding the accuracy of JP's pediatric medical records, the Claims Court quoted the testimony of Dr. Spitz in the remand decision of October 21, 2008 where he testified that in his experience pediatric records do not generally show an accurate picture of a child's neurological condition. A-100-1003.

Dr. Spitz also testified concerning hypertonic spells, the condition the Appellant asserts JP presented with on July 20, 1999. In response to questions posed by the Special Master, Dr. Spitz testified that a hypertonic spell "describe a child who is flaccid, who is not responsive on a temporary basis, and could be any number of things. What it is not according to the testing done, it is not a seizure", but it is not inconsistent with a finding of an encephalopathy, and one could be the other. A- 104.

Dr. Spitz reviewed JP's 2000, 2002 and 2005 MRI's relative to the issue of a Chiari I Malformation. Dr. Spitz explained that the damage from a Chiari I Malformation is due to compression on the tissues at the base of the skull, which cannot occur until the malformation has progressed far beyond that seen in JP in

---

[11] The involuntary eye movements of nystagmus are caused by abnormal function in the areas of the brain that control eye movements.
http://www.nlm.nih.gov/medlineplus/ency/article/003037.htm

the 2005 MRI and in the operative reports. He testified that there was no sign of any Chiari I Malformation until 2005, and that at the time it was mild and could not explain the symptoms JP was manifesting in 1999. A-114-116, 1119-1124.

Dr. Mary Megson, is a developmental pediatrician. She is Board Certified in General Pediatrics and has been practicing as a developmental pediatrician since 1984. She has extensive experience in developmental issues and as of December 2, 2008, the day she testified, had seen over 4,400 patients. A-441-442.

Dr. Megson was called as an expert to testify to the means by which tetanus toxoid causes the types of symptoms JP manifested. The Special Master did not consider her opinion as to causation. The Claims Court found that the Vaccine Injury Table and case law provided sufficient evidence of the ability of pertussis to cause an encephalopathy to satisfy the appellee's burden of causation, A-32-33, thereby rendering Dr. Megson's testimony as to causation moot.

However, largely in response to questions by Special Master III and by Appellant, Dr. Megson testified concerning JP's development from birth to early 2000. She testified that based on the July 20, 1999 examination and the uncontroverted testimony of descriptions of JP's conduct by his father, Ms. Dazzo and Ms. Costello, JP's development at two months was advanced. A-456. Relying on the fact that JP's developmental progress regressed. i.e., he was turning to voice

27

before the vaccinations and ceased doing so thereafter, she testified that his static encephalopathy began with the episode the evening of July 20, 1999. A-507-508, 536.  In response to questions from the Special Master concerning JP's November 8, 1999, examination, Dr. Megson testified that both failure to roll over and failure to sit without support, were symptoms of developmental delay that would have been sufficient for her to have referred JP for special assistance.  A-530-532.  In response to questions concerning JP's failure to pull to stand at nine months she testified that failure to do so constituted delay, and that the notes for that day relating to extremities did not refer to muscle tone, but to whether the child had lesions or how floppy he was. A-532-533.

Dr. John Shane testified in place of Dr. Spitz at the July 20, 2007 continuation of the October 28, 2005 hearing, and again at the  December 2, 2008 hearing on remand.   Dr. Shane, a pathologist and neuropathologist, A740-41,  was Chairman of the Department of Pathology at Lehigh Valley Hospital, in Allentown, Pa., A-738, and had been an instructor in neuropathology and cardiovascular pathology at St. Agnes Hospital,   as well as at Penn State College of Medicine. A-738.   While at St. Agnes, he worked with Dr. Sptiz for ten years on approximately 500 neurological cases a year, a significant number of which included Chiari I Malformations. A-739.

28

While Dr. Shane was called as an expert to replace Dr. Spitz, he was not permitted to testify about any issues other than the Chiari I Malformation at the July 2007 hearing.  He testified that the MRI in 2000 showed no sign of a Chiari I Malformation, although at that time JP was clearly symptomatic. He testified that the 2002 MRI also revealed no herniation significant enough to cause the type of compression required to cause JP's symptoms, and that although the 2005 MRI showed a malformation, it was insufficient to cause the type of symptoms JP was manifesting. A-775-759, 760.  Indeed, where a patient has no visible damage to the spinal cord, i.e., a syrinx, surgery which relieved that pressure should relieve symptoms.  JP had no damage to his spinal cord, and had little or no improvement in his condition after his surgery. A-769.

In response to extensive cross-examination by Special Master II, Dr. Shane maintained that what was shown on the 2002 and 2005 MRI's were within recognized normal limits, although the 2002 MRI revealed a slight herniation, and the 2005 MRI revealed a slight extension.  He testified that although he thought that the surgery was warranted as the herniation was extending slightly, it would not affect JP's symptoms, particularly the cognitive symptoms that were cerebral and unrelated to the region of the brain involved. A-773-780.

29

Dr. Max Wiznitzer, M.D. was called as the Appellant's sole witness. He is a pediatric neurologist who has testified extensively in the Vaccine Injury Program on behalf of the Appellant. Appellant conceded that Dr. Wiznitzer could not testify to a reasonable degree of medical certainty that the Chiari 1 Malformation was a cause of JP's symptoms. A-338.

## STANDARD OF REVIEW

Pursuant to the Vaccine Act, the Court of Federal Claims reviews a Special Master's decision to determine if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 42 U.S.C. § 300aa–12(e)(2)(B). The Federal Circuit reviews the Special Master's decision using the same standards. The Federal Circuit reviews the Court of Federal Claims legal determination de novo as to whether the Special Master acted in a manner not in accordance with the law. *Althen v. Sec'y of Health & Human Servs.supra* 1277–78 (citing *Hines v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1524 (Fed.Cir.1991)). While the Federal Circuit owns no deference to either the Special Master or to the Court of Federal Claims on questions of law, *Whitecotton v. Sec'y of Health & Human Servs.,* 81 F.3d 1099, 1106 (Fed.Cir.1996), the Circuit reviews factual findings for clear error, *Hines,* 940 F.2d at 1523., *Markovich v. Secretary of Health and Human Services,supra* 1356, (Fed. Cir. 2007)

30

## SUMMARY OF THE ARGUMENT

The Claims Court correctly found that *Markovitch, supra,1358* mandates that the first symptoms of a vaccine injury are the first symptoms seen by anyone that a member of the medical profession would recognize as a symptom of the injury eventually diagnosed. Here, JP's injury is a static encephalopathy which, in a baby, is evidenced by crankiness and developmental delay. At 10.5 months JP was found to be functioning developmentally at a 5-7 month level following months of development deemed by his pediatrician to be "on the verge" of a diagnosis of delay.

JP had been a healthy and normally developing child at the age of two months when he had a conceded adverse reaction to the DTaP vaccination on July 20, 1999. The reaction was a seizure like event. His surviving parent[12], his grandmother and neighbor testified that he became cranky, had an immediate loss of developmental skill on the day of the vaccination as he ceased turning to voice and began having trouble nursing.

The first medical record of JP's delay was noted on November 8, 1999, at his six month examination. JP could not roll over, deemed a symptom "on the verge" of developmental delay by his pediatrician, and actual delay by Dr.

---

[12] JP's mother died in early 2002.

31

Megson, a developmental expert.  At his nine month examination in January of 2000 JP could not pull to stand.  This was deemed a symptom of slow development by Dr. Turow, Dr. Megson and Dr. Wiznitzer, three medical experts.  Special Master III's declaration that petitioner's experts did not contest that JP was developing normally at 9 months is simply wrong.

The first direct symptom of his static encephalopathy was recorded on October 4, 1999.  JP's parents reported  that JP had episodes of strange eye movements.  Doctors did not witness these intermittent eye movements until March of 2000, when they were then diagnosed as intermittent nystagmus, a symptom of a brain injury, i.e. an encephalopathy.  JP's treating physician testified that it is common that intermittent conditions are not to be seen by doctors.

On this record, the Claims Court correctly held that where, as here, JP was finally diagnosed as developmentally delayed due to a static encephalopathy, which diagnosis requires him to be two standard deviations below the norm, symptoms of delay recorded prior to that diagnosis are symptoms this Court, in *Markovitch,* deemed to be the first symptoms of an injury, even if not recognized as such at the time.   Therefore, as the medical  record establishes that JP was in fact delayed, the symptoms described by lay witnesses and those recorded in the medical records for October and November of 1999, and January 2000, establish

he was suffering from his static encephalopathy from the date of the vaccination. The Special Master ignored the mandate of *Markovitch* to deny entitlement and thus, committed an error of law and was arbitrary and capricious.

## ARGUMENT

### I

### THE CLAIMS COURT CORRECTLY DETERMINED THAT PERTUSSIS CAN CAUSE CHRONIC (STATIC) ENCEPHALOPATHY

The Appellant conceded that the DTaP vaccination caused JP's July 20, 1999 adverse reaction.  A-337.  Deeming the Appellee not to have met the other two prongs of *Althen*,  the Special Master did not make a determination as to the first prong of *Althen, supra* (that the vaccine can cause the injury).  The Claims Court held that the Vaccine Injury Table itself establishes that pertussis vaccine can cause a chronic encephalopathy, the injury manifested in JP.  A-33. The Claims Court cited to 42 C.F.R. 100.3, as well as case law, *Perez v. Sec'y of H.H.S.* 2008 WL 763301 *39. (Cl. Ct. 2008).   Since the fact that JP has a static encephalopathy has been conceded, A-337, the sole issue is whether the record as a whole establishes that the adverse reaction caused the static encephalopathy.

Special Master III disregarded the three experts who testified on behalf of the Appellee on the issue of prong one of *Althen, supra*.  Special Master III found that Dr. Megson's testimony as to the effect of pertussis on calcium channel

function was confusing, and that the large amount of literature she submitted in support of her report and her testimony would take the Court years of intense medical study to understand. A-66.  It is noteworthy that Appellant correctly stated, Brief p. 8, that  "Congress intended that the Special Masters of this court to be 'well advised in matters of health, medicine and public health'" and have the power to retain experts to explain anything they do not understand.  1989 U.S.C.C.A.N. 3018, H.R. Rep. No. 101-386, 515.  Special Master III confined Dr. Spitz testimony to the table injury case, despite the fact that a table injury also requires proof of sequella lasting six months, and deemed Dr. Shane incredible.

The Claims Court did not review the Special Master III's rejection of this evidence, deeming the Table and case law to fully satisfy prong one of *Althen*.  It is well established that a court may take judicial notice of its own prior decisions in cases involving the same essential questions of fact.  See  *Butler v. Eaton*, 141 U.S. 240, 243-44 (1891), *Allen v. State Bd. of Ed. of N. C.* 55 F.R.D. 350 (M.D.N.C., 1972).

II

**THE COURT BELOW CORRECTLY FOUND THAT SPECIAL MASTER III'S DECISION THAT THE APPELLEE HAD NOT ESTABLISHED A LOGICAL CONNECTION BETWEEN THE VACCINATION AND HIS STATIC ENCEPATHOLPATHY WAS NOT SUPPORTED BY THE RECORD AND WAS THUS, ARBITRARY AND CAPRICIOUS AND OTHERWISE NOT ACCORDING TO LAW**

Developmental delay, according to Dr. Turow, is not established by the medical profession until a child's development is two standard deviations below the mean. In the numerous tests and examinations conducted after JP was first diagnosed as delayed in March of 2000, he was consistently found to be delayed by between 25 and 50%. See ex. A-1473, (5.5-7 months at 10.5 months of age), A-375, 1287, (6 month achievements at 12 months), A1488 (7-11 months at 17 months). According to Dr. Turow, a static encephalopathy is a brain malfunction which is static, not evolving. A-381. The post-January 2000 evaluations of the degree of JP's developmental delay are consistent with Dr. Turow's testimony that based upon JP's 9 month examination on January 31, 2000, JP was functioning at a 6-7 month level, i.e. 25 to 33% delayed. A-422.

The Claims Court found that Special Master III erred in failing to find that the appellee had established that JP was symptomatic of his encephalopathy on October 4, 1999, November 8, 1999 and January 31, 2000. The Claims Court was

35

correct. Special Master III's decision, speculating these symptoms were consistent with normal variations in development, flies in the face of the record that JP was in fact delayed.

It is expected that a child's developmental skills evolve with age. Herein, at two months, the medical records indicated that JP could roll to his side, an advanced skill for a two month old. A-382. Thereafter JP's development changed dramatically, but it was not until March 2000, when he was two standard deviations below the mean, that his delays were significant enough to be formally diagnosed as such. During his November, 1999, six month exam, four months after the adverse reaction, JP was unable to roll over, a normal 5-7 month achievement. Dr. Turow expected that an infant who had rolled to side at two months would have achieved this skill by six months. A-370-71. Based upon that, Dr. Turow determined that JP was on the "verge" of developmental delay as of his six month examination. A-384.

Dr. Megson responding to questions by Special Master III, found both failure to roll over and failure to sit without support were symptoms of delay sufficient to deem JP delayed as of November 8, 1999. A-530-531. Indeed, Special Master III's statement that Dr. Megson and Shane did not assert that JP was delayed is absolutely incorrect, since Dr. Megson testified that she would have

referred JP for special services based upon his six month examination. A-530-532.[13]   While not definitive of an injury in medical terms,

> …in many Vaccine Program cases the injuries are first manifested as subtle signs… so subtle as to be unrecognized at their onset.

*Sharpnack, By and Through Sharpnack v. Secretary of Dept. of Health*, Not Reported in Cl.Ct., 1992 WL 167255*2 (Cl.Ct.,1992), affirmed 17 F.3d 1442 (Fed. Cir. Jan 07, 1994) (Such symptoms establish the existence of an injury even if that it is not recognized as such until sometime later).   See *Markovich,supra,  Hunt ex rel. Alva v. Secretary of Dept. of Health and Human Services*, Not Reported in Fed. Cl., 2010 WL 1783541 (Fed.Cl.,2010) (holding that where a child is finally diagnosed with an injury, vague or incomplete medical records support the fact of onset earlier even if the doctor does not recognize the connection at that time), *Whitecotton by Whitecotton v. Secretary of Health and Human Services,supra* 1108-09. (Reversed, citing 42 U.S.C. § 300aa–13(b) as the Special Master had not considered that a test given shortly after a time period can be evidence that a condition arose within the time period).

Dr. Wiznitzer, Appellant's  expert, concurred with appellee's experts that as of the nine month examination JP's failure to pull to stand  was "toward the border" A-579-80, i.e. a symptom of delay.  Dr. Wiznitzer's statement  constitutes

---

[13]  Dr. Shane also found his a symptom of delay, A 640,655-66,.

an admission that JP was developmentally delayed as of that date, thus, evidencing the presence of his static encephalopathy. The date when these symptoms were first manifested, not the date of diagnosis, determines when the condition existed. *Markovich, supra*, 1358 . It is respectfully submitted that Special Master III is not qualified to deem these symptoms non-existent or as being consistent with normal development where, as here, the entire medical record establishes that the child was in fact delayed.

In the face of this record the decision of Special Master III is (1) "illogical," (2) "implausible," or (3) without "support in inferences that may be drawn from the facts in the record." *U.S. v. Hinkson*, 585 F.3d 1247.1262 (9th Cir. 2009). Here, the medical records show continuous failure to make adequate developmental progress based upon facts medical professionals testified constituted evidence of delay.

The Claims Court correctly held there was no rational connection between the evidence and the decisions made by the Special Master and that fact compelled the Claims Court to reverse. See *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, (1962) (An agency must make findings that support its decision, and those findings must be supported by substantial evidence.)

38

III

## THE SPECIAL MASTER ERRED IN DEEMING JP'S EYE MOVMENTS STRABISMUS AS NO EVIDENCE IN THIS RECORD SUPPORTS THAT CONCLUSION

Nystagmus is caused by a neurological malfunction. A-366, 895[14]..
Therefore, the first sign of JP's encephalopathy to find its way into the medical record, after July 20, 1999, was the parent's report of strange eye movements recorded by Dr. Turow on October 4, 1999, just over two months following the adverse reaction. These eye movements were not diagnosed as nystagmus until March of 2000, when Dr. Fagen, the first medical professional to witness an episode, diagnosed the condition. A-1272.

By concluding that the condition seen in 1999 was strabismus, Special Master III disregarded the testimony of Dr. Turow that because a doctor does not see a condition does not mean it didn't exist. A-405. JP's parents reported this condition on October 4, 1999, just two and a half months after the conceded adverse reaction. Dr. Turow testified that in his experience a condition which was finally seen by a doctor, months after parents reported a symptom, was generally what the parents initially saw. A-405-06. See *Loving ex. rel. Loving v. Sec'y of Dept. of Health & Human Servs,* 86 Fed. Cl. 135, 152 (2009). (theory of causation

---

[14] "Nystagmus" is the rhythmic oscillation of the eyeballs, either pendular or with slow and fast component" Stedman's at 1350. A-14.

is not disproved where record shows that no doctor examined the child at a time when the symptoms would be apparent or relevant to the purpose of the medical visit).  Mr. Paterek, who did see the condition in October of 1999, testified that what he observed and reported  in 1999 was the condition JP still has, i.e. nystagmus.  A-695.

Special Master III's finding that there is no mention of eye movements in the record between November 17, 1999 and March, 2000, establishes that they had ceased is another failure to base his decision on the entire record.  Dr. Turow testified that once Dr. Rubin deemed the condition benign, it was of no concern until Dr. Fagen witnessed these movements and determined that it was nystagmus, a serious symptom.  A- 403-04.

Further, Special Master III and the Appellant make much of the difference between Nystagmus and Strabismus.  Strabismus and pseudostrabismus were the suggested differential diagnosis of this phenomena based upon  parental reports in 1999.   The notation "deviation medially" A-1253, relied upon by  Special Master III, A-54, was written by a doctor who did not see this condition.  It is not inconsistent with the intermittent slow horizontal nystagmus diagnosis.  See FN 16. See. *Fed.R.Evid. 801–03*, see; *Douglas v. Victor Capital Gr.,* 21 F.Supp.2d 379, 383–84, 391 (S.D.N.Y.1998) (medical evidence consisting of unsworn doctors

letters is inadmissible hearsay); *Burgos v. City of Rochester,* No. 99 Civ. 6480, 2003 WL 22956907, at *3 (W.D.N.Y. Mar.31, 2003) (medical evidence which consisted of doctors' letters are "clearly inadmissible hearsay"); *see also Felice v. Long Island Railroad Co.,* 426 F.2d 192, 198 (2d Cir.1970) (a doctor's letter, which described the contents of another doctor's report, is inadmissible hearsay).

There is no evidence at all in this record to support the Special Master's conclusion. The speculation in Dr. Rubin's November 17th report turned out to be incorrect. In diagnosing SP's eye movements to be strabismus, Special Master III exceeded the limits of his role. *Raley v. Secretary of HHS*, No. 91–0732, 1998 WL 681467 (Fed.Cl. 1998) stating "[t]he requirement that [a] appellee['s] claims must be supported either by medical records or medical expert opinion simply addresses the fact that the special masters are not medical doctors, and, therefore, cannot make medical conclusions or opinions based upon facts alone."

Special Master III sought to ignore *Markovich, supra,* and *Wilkerson v. Secretary of Health and Human Services* 593 F.3d 1343, 1346 (Fed. Cir, 2010) (…time for filing runs from "the date of the occurrence of the first symptom or manifestation of onset," not the date of its recognition.) by finding that the condition was strabismus and that it was unrelated to JP's encephalopathy. Where, as here, the only condition diagnosed by medical professionals was nystagmus, A-

41

405-06, *Markovich* compels a determination that this condition was nystagmus, the symptom of encephalopathy, A-632, A-995, witnessed on or about October 4, 1999.

The Court of Claims correctly found that Special Master III violated the mandate of *Markovich, Supra,* in not considering the belated diagnosed October 4, 1999 eye movements as the first sign of JP's encephalopathy reflected in the medical records.   Special Master III's decision used isolated statements out of context, ignored the further consideration of these issues in the balance of the record, and thus, was arbitrary and capricious and not in accordance with the law. *Dobrydneva v. Sec'y H.H.D.*   94 Fes. Cl. 134 (2010) (Special Master abused his discretion in failing to consider relevant evidence and deliberately omitted relevant evidence).

## IV

## THE COURT BELOW CORRECTLY FOUND THAT  SPECIAL MASTER III'S RELIANCE ON PORTIONS OF THE MEDICAL RECORDS WAS ERROR, WHERE, AS HERE, SUBSTANTIAL UNCONTESTED TESTIMONY DISCREDITED THOSE PORTIONS OF THE PEDIATRIC RECORDS

Special Master III justified his failure to consider the testimony of the lay witnesses and Appellees experts by referring to Judge Braden's comment in the October 21, 2008 Remand Decision, that where witness statements conflict with

the medical records, that testimony is entitled to little weight.    Contrary to Special

Master III's assertion, the Court of Claims on its review of the decision of Special

Master II did not uphold Special Master II's failure to credit lay testimony.    The

Claims Court did precisely the opposite.    Citing to *Markovic. supra v.,*1358   the

Claims Court held that if:

> "subtle symptoms" recognized by a parent are sufficient to trigger the statute
> of limitations those same observations do not then become irrelevant or
> unreliable in determining causation, as occurred in this case. (A-153-157).
> Parental observation is relevant and reliable evidence, but is entitled to even
> more weight if substantiated by the medical records, reviewed in their
> entirety. Of course, where parental observation is in conflict with medical
> opinions, it is entitled to "little weight" or deference. See *Cucuras v. Sec'y of
> Health & Human Servs.*, 993 F.2d 1525,1528 (Fed.Cir.1993).   In this case,
> parental observation was not in conflict with medical records; the medical
> records simply were not clear or complete. That fact does not render parental
> observation irrelevant; only that parental observation alone does not satisfy
> Plaintiff's burden of proof to establish each of the causation-in-fact elements
> of Althen by a preponderance of evidence.

In *Doe 21 v. Secretary H.H.S.* 84 Fed. Cl. 46, 49-50, (Cl. Ct. 2008). A-131.

Special Master III selectively quoted the Court of Claims, and in defiance of its

guidance continued to discredit or ignore lay testimony.    In addition, Special

Master III only considered the medical record for six months following the

vaccination, A-41, a fact which the Court below correctly deemed a failure to

review the entire record. A-36.  Special Master III deemed the medical records to

be a complete record of JP's condition, in spite of  Dr. Turow's testimony setting

forth the limits of those records.  A-429-30.  Dr. Turo's testimony confirmed Dr. Sptiz's testimony before Special Master II, quoted extensively by the Claims Court in its remand decision,  A-98-104,  in reaching the conclusion that such reliance was not supported by this record.

Special Master III's reliance on discredited records is an error of law.  See, *Loving supra* 152 (reversing the special master as vague or incomplete records cannot support a decision).  See *Adams v. United States*, No. 98-5011, 1998 WL 804552, at *4 (Fed. Cir. Sept.23, 1998) (unpublished) (information as to responsibilities contained in a general description of  a position's duties is too vague and unreliable to qualify as dispositive evidence of an employee's status as an administrator).  Indeed, Special Master  III's acceptance of the records as a complete picture of JP's condition at all times, over all other evidence, in the face of Dr. Turow's testimony that the records were not complete and were even inaccurate, A395-96, 398, defies the mandate of *Adams* and the experience of the Court[15].

---

[15]  Indeed, Special Master III, who credited Dr. Turow but discredited Dr. Megson, relies on Dr. Megson's opinion as to the quality of the records to deem the records complete. A-48.  Dr. Megson was not a member of Dr. Turow's office and was not competent to testify as to the practices of that office with respect to maintenance of medical records.

44

> My experience in dozens of these cases is that medical records are very inconsistent and that blind reliance on the assumption that the records fully and accurately describe all events is unwarranted. Omissions from medical records of clearly established events is rather common, and no strong inference can be drawn from any particular omission by itself.

*Clark v. Sec'y of Health and Human Servs.*, 1991 WL 57051 (Cl.Ct.Spec.Mstr. March 28, 1991).

> <u>If a record was prepared by a disinterested person who later acknowledged that the entry was incorrect in some respect, **the later correction must be taken into account**</u>. Further, it must be recognized that the absence of a reference's to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance. Since medical records typically record only a fraction of all that occurs, the fact that reference to an event is omitted from the medical records may not be very significant.

*Campbell v. Sec'y of Health and Human Servs*, 69 Fed.Cl. 775, 779 (Fed.Cl., 2006); *Camery v. Sec'y of Health and Human Servs.,* 42 Fed.Cl. 381, 391 (Fed. Cl. 1998).

The lay testimony, none of which is contradicted by the medical records, establishes that there were continuous symptoms of static encephalopathy evidenced by JP from the date of the adverse reaction to the vaccination to date. See A-888-89, 885-87, 889, 895, 915-17, 931, 946-947.

By not considering Dr. Turow's limitation of the value of the medical records his office maintains, and ignoring the testimony of lay witnesses as to JP's

condition after the vaccination,  Special Master III reached a conclusion that JP was developing normally for six months, a conclusion that is not supported by any medical evidence.  The Claims Court correctly determined that this conclusion was arbitrary, capricious and not according to law.

V

## THE COURT BELOW CORRECTLY DETERMINED THAT SPECIAL MASTER III DID NOT CONSIDER THE RECORD AS A WHOLE

Special Master III deemed records created after the initial diagnosis of JP's static encephalopathy in March, 2000, to be irrelevant to a determination of whether his encephalopathy resulted from his adverse reaction to the July 20, 1999 vaccinations.

Special Master III ignored Dr. Fagen's diagnosis of the eye movements observed by the parents in October, 1999 as nystagmus, a symptom of brain damage.  He also ignored the educational evaluation records, establishing  JP's motor skill delay was between 33% and 50%, or about the degree of delay he had on January 31, 2000 at his nine month examination,  just over five months after his adverse reaction.

Appellant's attempt to assert a Chiari I Malformation as an alternative cause unrelated to the vaccine all relied on records created long after March of 2000.

Special Master III may justifiably have deemed the Appellant to have yielded this point by its concession that its expert could not attribute JP's delays to that condition. See A-338-339. Regardless, the Chiari 1 Malformation was not discovered until 2005, and the first slight signs of it were seen in a re-evaluation of the 2002 MRI. Since the MRI of June, 2000, established that this condition did not exist in 1999 and 2000, A-380, it cannot explain any of JP' symptoms in issue here, See A-381 despite Appellants claims to the contrary.

Dr. Turow concured with Dr. Spitz, that unless there is a syringomyelia, it is unlikely that a Chiari malformation could explain JP's symptoms. (Compare A-386 with A-1118-1121). Dr. Eviatar's attribution of JP's symptoms to the Chiari I Malformation is inconsistent with the opinion she gave to Dr. Turow. A-386-87. Dr's Pavlakis and Zito both found that there was no malformation, or any obstruction of the brain stem sufficient to cause any of JP's symptoms at any time, and specifically not in early 2000 when his delay was fully established. A-1762-3, 1765.

## VI

## DR. TUROW'S TESTIMONY SUPPORTS THE CONCLUSION THAT JP MORE LIKELY THAN NOT SUFFERED A VACCINE INJURY

While the appellant is correct that Dr. Turow never unequivocally declared that he believed JP was injured by the DTaP vaccine, the significance of that is eliminated by the Appellant's concession that JP did in fact suffer an adverse reaction to the July 20, 1999 DTaP vaccination. The issue at bar was not causation, but whether the static encephalopathy was the sequella of that conceded reaction.

Dr. Turow did testify that he believed it was possible that JP suffered "…a significant reaction which changed the way his brain works over time. A-427. Notably, pertussis was withheld for all JP's vaccinations after July 20, 1999 due to concern about the adverse reaction to the DTaP vaccination. A-373, 418 .   On September 19, 2002 Dr. Turow wrote a letter in which he stated that JP's encephalopathy was likely related to his reaction to the pertussis vaccination, and still believes that is possible.   A-383.   He also testified he knew of no other explanation for JP's condition.   A-383.   He testified that where a child has a reaction within a day and "has a catastrophic result, then I believe it leads to the vaccine".   Dr. Turow could not say the vaccine was responsible here, as "I just don't have concrete evidence to connect the two".   Thus, he was applying a much higher standard than is required in this program.

48

CONCLUSION

Where as here, JP had a conceded adverse reaction on July 20, 1999 to the DTaP vaccine, evidenced a static encephalopathy due to developmental delay which reached two standard deviations below the mean and was then formally diagnosed by March of 2000, and having had ophthalmologic issues on October 4, 1999 eventually diagnosed as a symptom of that encephalopathy, evidenced slow development on the verge of being diagnosed as delayed on November 8, 1999 and functioning at 5-7 months on his 9 month examination on January 31, 2000, the decision of Special Master III deeming JP to have been developing normally and to have suddenly become delayed between January and March of 2000 is a decision which is not supported by the record. Further, Special Master III's use of speculation to discount all symptoms of delay before January of 2000 in the face of testimony of medical experts deeming the delays noted to be symptoms of his eventually diagnosed condition, was contrary to the evidence, irrational and an error of law. The contortions used by the Special Master to deny compensation in this case indicate a breach of the duty to afford petitioners fundamental fairness.[16]

---

[16] In the remand decision this office was criticized for not pointing out that Special Master II had been reversed previously for the same errors he made in this case. Thus, we feel compelled to note that the following are examples of cases in which decisions of Special Master III have been set aside for similar errors which seem to go beyond mere disagreements as to the applicable standards. In

Dated, New York, N.Y.                          /s/ John F. McHugh
     September 20, 2012              John F. McHugh
                                               233 Broadway, Suite 2320
                                               New York, N.Y. 10279
                                               212-483-0875

---

*Dobrydneva v. Sec'y, H.H.S.* 98 Fed. Cl. 190,208 (Fed. Cl. 2011) (Either the Special master did not carefully review the record or purposefully neglected to discuss highly relevant evidence from (petitioner's) primary treating physician), *Campbell v. Sec'y H.H.S.* No 07-465, 2011 WL 128964 *16, "[a] finder of fact can only dismiss so much evidence on grounds that such evidence is not 'binding' until it appears, as it does in this case, that he simply failed to consider genuinely the evidentiary record before him". *Dobrydneva v Sec'y H.H.D.* 94 Fed. Cl. 134 (2010) (Special Master abused his discretion in failing to consider relevant evidence and deliberately omitted relevant evidence); *Morse v. Sec'y H.H.S.* 93 Fed, Cl, 780 (2009),(Special Master made improper credibility determinations, applied an incorrect legal standard regarding petitioners medical theory and **drew every inference against the petitioner**); *Loving v. Sec'y H.H.S.* 86 Fed. Cl. 135 (2009) (Special Master failed to examine the record in its entirety and based his finding on the absence of evidence in the record, even though the parties agreed that the medical records were not properly kept).

# United States Court of Appeals
# for the Federal Circuit

## CERTIFICATE OF SERVICE

James L. Paterek v. Secretary of Health and Human Services:  2012-5078

I, Kersuze Morancy, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by JOHN F. MCHUGH, P.C., Attorneys for Petitioner-Appellee to print this document.  I am an employee of Counsel Press.

On **September 20, 2012**, Counsel for Appellee has authorized me to electronically file the foregoing **Brief for Petitioner-Appellee** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Stuart F. Delery
Thomas M. Bondy
Teal Luthy Miller
Department of Justice
Civil Division, Room 7234
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

*Attorneys for Respondent-Appellant*


Upon acceptance by the Court of the e-filed document, six paper copies will filed with the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Kersuze Morancy
Kersuze Morancy

Certificate of Compliance

This brief is typed in Times New Roman 14 pt. and contains 10,813 words according to the word count feature of Microsoft Word.

/s/ John F. McHugh
John F. McHugh